UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

UNITED STATES OF AMERICA,

         Plaintiff,

v.

SEAN JOSEPH BEAULIEU,

         Defendant.

Court File No. 20-cr-235 (ECT/LIB)

**REPORT AND RECOMMENDATION**

This matter comes before the undersigned United States Magistrate Judge upon Defendant Sean Joseph Beaulieu's ("Defendant") Motion to Suppress Statements, Admissions, and Answers, [Docket No. 27]. This case has been referred to the undersigned Magistrate Judge for a report and recommendation, in accordance with 28 U.S.C. § 636(b)(1) and Local Rule 72.1. The Court held a motions hearing on May 25, 2021, regarding the parties' pretrial motions at which the parties requested the opportunity to submit supplemental briefing on the present motion. The supplemental briefing was completed on July 8, 2021, and this Court took Defendant's Motion to Suppress Statements, Admissions, and Answers, [Docket No. 27], under advisement on July 8, 2021.[1]

For reasons discussed herein, the Court recommends that Defendant's Motion to Suppress Statements, Admissions, and Answers, [Docket No. 27], be **DENIED**.

---

[1]The Court addressed the parties' pretrial discovery motions by separate order. [Docket No. 43].

I.    **BACKGROUND AND STATEMENT OF FACTS**

A.  **Background**

Defendant is charged with one count of assault with a dangerous weapon, in violation of 18 U.S.C. §§ 113(a)(3), 1151, and 1153(a), and one count of assault resulting in serious bodily injury, in violation of 18 U.S.C. 113(a)(6), 1151, and 1153(a). (Indictment [Docket No. 1]).

B.  **Facts**

The record presently before the Court indicates that Special Agent Eric Hellekson ("SA Hellekson") became involved in this case after an agent at the FBI Bemidji office requested that SA Hellekson interview Defendant at the Sanford Health Hospital in Fargo, North Dakota. (Tr. [Docket No. 44], at 15). Defendant was admitted to the emergency department at the Sanford Health Hospital on June 20, 2020, for trauma evaluation following an altercation that occurred on the Red Lake Indian Reservation. (Def.'s Ex. 6).[2] On June 22, 2020, SA Hellekson and Task Force Officer Steven Long ("TFO Long") interviewed Defendant at the Sanford Health Hospital emergency room. (Id. at 15–17).

Prior to conducting the interview, SA Hellekson went to the nurses' station to determine whether it was alright to proceed with the interview of Defendant. (Id. at 16). SA Hellekson was informed that it was okay to proceed with the interview. (Id. at 16, 23). SA Hellekson was not informed, and was not aware, of the extent of Defendant's injuries, the treatment he was receiving, or why he remained in the emergency room. (Id. at 23–24, 28–29). However, SA Hellekson was aware that Defendant had previously been airlifted from the Red Lake Indian Reservation in Minnesota to the Sanford Health Hospital in Fargo, North Dakota. (Id. at 23).

---

[2] Defendant's Exhibit 6 consists of some of Defendant's medical records from the Sanford Hospital. (See, Def.'s Ex. 6). At the Motions Hearing, Defendant, without objection, offered the medical records into evidence as Defendant's Exhibit 6. (Tr. [Docket No. 44], at 13–14).

The interview took place in a standard emergency room, which was separated by a door from the people working in the emergency room. (Id. at 16–17). SA Hellekson, TFO Long, and Defendant were the only people in the room while the interview occurred. (Id. at 17). Defendant was not shackled during the interview. (Id.). SA Hellekson observed that Defendant had facial injuries, including a swollen face and left eye. (Id. at 24–25, see also, Def.'s Exs. 1–4).[3]

Before beginning the interview, SA Hellekson and TFO Long introduced themselves to Defendant, showed him their credentials, and they informed Defendant why they were at the hospital and that they wanted to talk to him. (Tr. [Docket No. 44], at 17). Next, at approximately 11:24 a.m. on June 22, 2020, SA Hellekson read Defendant his Miranda rights line-by-line from the FBI Advice of Rights form.[4] (Id. at 17–19, 21). In relevant part, the FBI Advice of Rights form contains the following text:

### YOUR RIGHTS

Before we ask you any questions you must understand your rights.

You have the right to remain silent.

Anything you say can be used against you in court.

You have the right to talk to a lawyer for advice before we ask you any questions.

You have the right to have a lawyer with you during the questioning.

If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.

If you decide to answer questions now without a lawyer present, you have the right to stop answering at any time.

[3] Defendant's Exhibits 1–4 are photographs taken of Defendant at the Sanford Health Hospital. (See, Def.'s Exs. 1–4; Tr. [Docket No. 44], at 25). At the Motions Hearing, Defendant, without objection, offered the photographs into evidence as Exhibits 1–4. (Tr. [Docket No. 44], at 13–14).
[4] SA Hellekson testified at the Motions Hearing that he read Defendant his Miranda rights because Defendant was laying down in a hospital bed injured, and SA Hellekson felt that Defendant would be unable to leave on his own. (Id. at 17).

**CONSENT**

> I have read this statement of my rights and I understand what my rights are. At this
> time, I am willing to answer questions without a lawyer present.

(Gov't's Ex. 2).[5] After informing Defendant of his <u>Miranda</u> rights, SA Hellekson asked Defendant if he had any questions. (Tr. [Docket No. 44], at 18). SA Hellekson then instructed Defendant to sign the FBI Advice of Rights form if he wanted to talk to the interviewers but to leave the signature line blank if he did not wish to speak with the interviewers. (<u>Id.</u> 18–19). At 11:27 a.m., Defendant signed the FBI Advice of Rights form thereby indicating that he wished to speak with the interviewers. (<u>Id.</u> at 18–19, 21; Gov't's Ex. 2).

At approximately 11:28 a.m. on June 22, 2020, SA Hellekson began recording the interview and started questioning Defendant.[6] (Gov't's Ex. 1, at 00:00–00:30).[7] During the June 22, 2020, interview, SA Hellekson questioned Defendant about an alleged assault that had occurred on the Red Lake Indian Reservation on June 20, 2020, during which, Defendant had sustained the injuries that caused him to be brought to the Sanford Health Hospital. (Gov't's Ex. 1). Defendant stated that prior to the assault, Tiffany, his cousin Rob Beaulieu, an unidentified male, and Defendant had been in a bedroom at Tiffany's residence. (<u>Id.</u> at 2:05–3:00, 6:15–7:05). Defendant further stated that Tiffany, Rob, and the unidentified male had been talking about "gang stuff," and that he must have gotten in the way because they assaulted him. (<u>See, e.g.,</u> <u>Id.</u> at 3:05–3:35). Defendant also stated that he did not remember anyone having any weapons, and Defendant denied using any weapons during the assault or stabbing anyone. (<u>Id.</u> at 7:15–7:50).

---

[5] At the Motions Hearing, the Government, without objection offered this Advice of Rights form into evidence as Government's Exhibit 2. (Tr. [Docket No. 44], at 13–14).

[6] SA Hellekson testified at the Motions Hearing that Defendant consented to the interview being recorded. (Tr. [Docket No. 44], at 20).

[7] At the Motions Hearing, the Government, without objection, offered the recording of the June 22, 2020, interview into evidence as Government's Exhibit 1. (Tr. [Docket No. 44], at 13–14).

The interview concluded at approximately 11:36 a.m. on June 22, 2020. (Id. at 8:05). Throughout the interview's recording, the interviewers can be heard maintaining a conversational tone without raising their voices to yell or threaten Defendant. (See, Gov't's Ex. 1). Likewise, Defendant maintained a conversational tone, and he was clearly cooperative and self-assured throughout the interview. (See, Id.). Defendant also responded appropriately and coherently to any questions presented.[8] (See, Id.).

## II.    DEFENDANT'S MOTION TO SUPPRESS STATEMENTS, ADMISSIONS, AND ANSWERS [Docket No. 27]

Defendant moves the Court for an Order suppressing the statements made by him to law enforcement during the June 22, 2020, interview conducted by law enforcement while Defendant was in the Sanford Health Hospital emergency room. (Mem. in Supp. [Docket No. 46], at 1).

In support of his motion to suppress, Defendant contends that his statements made during the June 22, 2020, interview were involuntary due to his injuries. (See, Id. at 7–10). Defendant also contends that the Government has failed to demonstrate that Defendant's statements were knowing and intelligent because SA Hellekson only began recording the interview after Defendant had been informed of, and waived, his Miranda rights. (See, Id. at 9–10). Therefore, Defendant argues that his statements made during the June 22, 2020, interview should be suppressed. (Id. at 10).

### A.  Standard of Review

"[Miranda] prohibits the government from introducing into evidence statements made by the defendant during a custodial interrogation unless the defendant has been previously advised of his [F]ifth [A]mendment privilege against self-incrimination and right to an attorney." United

---

[8] SA Hellekson testified at the Motions Hearing that during the June 22, 2020, interview, SA Hellekson understood what Defendant was saying, Defendant sounded coherent to SA Hellekson, and Defendant "seemed aware of what was going on." (Tr. [Docket 44], at 20, 26).

States v. Chipps, 410 F.3d 438, 445 (8th Cir. 2005) (citing Miranda v. Arizona, 384 U.S. 436, 444 (1966)). Accordingly, Miranda warnings are required for official interrogations where a person has been "taken into custody or otherwise deprived of his freedom of action in any significant way[.]" Stansbury v. California, 511 U.S. 318, 322 (1994) (quoting Miranda, 384 U.S. at 444).

A defendant is entitled to a Miranda warning prior to custodial interrogation. Miranda, 384 U.S. at 444–45. "Interrogation under Miranda includes not only express questioning but also its functional equivalent, such as 'any word or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.'" United States v. Hull, 419 F.3d 762, 767 (8th Cir. 2005) (quoting Rhode Island v. Innis, 466 U.S. 291, 300–01 (1980)). Whether an incriminating response is sought by an officer is determined "from the perspective of the suspect" and not by the officer's actual intent. United States v. Richardson, 427 F.3d 1128, 1132 (8th Cir. 2005).

A defendant may waive their rights, "provided the waiver is made voluntarily, knowingly and intelligently." Miranda, 384 U.S. at 444.

### B. Analysis

Defendant contends that all of his statements made during the June 22, 2020, interview were custodial and were not proceeded by a voluntary, knowing, and intelligent waiver of his Miranda rights. (Mem. in Supp. [Docket No. 46], at 7–10).

As noted above, Miranda warnings are required for official interrogations where a person has been "taken into custody or otherwise deprived of his freedom of action in any significant way[.]" Stansbury, 511 U.S. at 322 (quoting Miranda, 384 U.S. at 444). To be subject to suppression under Miranda, a statement must be made while in custody and in response to interrogation. United States v. McGlothen, 556 F.3d 698, 701 (8th Cir. 2009) (citing United States

v. Londondio, 420 F.3d 777, 783 (8th Cir. 2005)). A defendant may nevertheless waive his rights, "provided the waiver is made voluntarily, knowingly and intelligently." Miranda, 384 U.S. at 444.

It is undisputed that the questioning of Defendant during the June 22, 2020, interview constituted interrogation. (See, Mem. in Supp. [Docket No. 46]; Mem. in Opp'n [Docket No. 50]). It is also undisputed that the June 22, 2020, interview was custodial in nature. (See, Mem. in Supp. [Docket No. 46]; Mem. in Opp'n [Docket No. 50]). The record also clearly demonstrates that Defendant was given a Miranda warning at the outset of the interview both verbally and in writing, and Defendant acknowledged in writing that he understood the rights warning. (See, Tr. [Docket No. 44, at 17–19, 21; Gov't's Ex. 2). The FBI Advice of Rights form signed by Defendant represents an express waiver of those rights. (See, Gov't's Ex. 2).

Accordingly, the only issue now before the Court regarding the June 22, 2020, interview is whether Defendant's waiver of his rights was made voluntarily, knowingly, and intelligently. See, gen., Miranda, 384 U.S. at 444, 475. The validity of a Miranda waiver requires consideration of two distinct inquiries, namely whether the waiver was voluntary "in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception[,]" and whether the waiver was knowingly and intelligently made "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." United States v. Vinton, 631 F.3d 476, 483 (8th Cir. 2011) (internal citations omitted) (quoting Moran v. Burbine, 475 U.S. 412, 421 (1986)). "The government has the burden of proving the validity of the Miranda waiver by a preponderance of the evidence." United States v. Haggard, 368 F.3d 1020, 1024 (8th Cir. 2004).

### 1. Voluntariness

Courts assess whether a waiver of rights pursuant to <u>Miranda</u> was made voluntarily by considering "the conduct of law enforcement officials and the suspect's capacity to resist any pressure." <u>United States v. Contreras</u>, 372 F.3d 974, 978 (8th Cir. 2004). The United States Supreme Court has previously explained "that coercive police activity is a necessary predicate to . . . finding that a confession is not 'voluntary,'" <u>Colorado v. Connelly</u>, 479 U.S. 157, 167 (1986), and the Eighth Circuit has read that holding to mean "that police coercion is a necessary prerequisite to a determination that a waiver was <u>involuntary</u> and not as bearing on the separate question whether the waiver was knowing and intelligent." <u>United States v. Turner</u>, 157 F.3d 552, 555 (8th Cir. 1998) (quoting <u>United States v. Bradshaw</u>, 935 F.2d 295, 299 (D.C. Cir. 1991)).

In determining whether a waiver or confession was made voluntarily, a court "looks at the totality of the circumstances and must determine whether the individual's will was overborne." <u>United States v. Syslo</u>, 303 F.3d 860, 866 (8th Cir. 2002). In considering the totality of the circumstances, a court reviews whether the statement was "extracted by threats, violence, or direct or implied promises, such that the defendant's will was overborne and his capacity for self-determination critically impaired." <u>United States v. Sanchez</u>, 614 F.3d 876, 883 (8th Cir. 2010) (internal quotation marks and citations omitted). "More specifically, [a court] consider[s], among other things, the degree of police coercion, the length of the interrogation, its location, its continuity, and the defendant's maturity, education, physical condition, and mental condition." <u>Id.</u> (citing <u>Sheets v. Butera</u>, 389 F.3d 772, 779 (8th Cir. 2004)).

Here, Defendant contends that his waiver and subsequent statements were not voluntary because he "was lying in a hospital bed after being severely beaten about the head and face," "[h]is face was swollen and his severe injuries were readily apparent to [SA] Hellekson," and "[t]wo

doctors who visited with [Defendant] the same morning believed that he was experiencing some sort of delirium related to a possible brain injury." (Mem. in Supp. [Docket No. 46], at 9). However, the mere fact that Defendant was injured and in the hospital at the time of the June 22, 2020, interview does not render his waiver or statements involuntary unless the overall impact of the interview caused his will to be overborne. See, e.g., United States v. El-X, No. 11-109 (PJS/JJG), 2011 WL 3155691, at *4 (D. Minn. July 6, 2011), report and recommendation adopted by 2011 WL 3154859 (D. Minn. July 26, 2011) ("As long as the person's will was not overborne and the officer did not engage in coercive activity, even a defendant who is hospitalized and medicated may give a voluntary statement.").

The Court's review of the totality of the circumstances shown in the present record does not indicate that Defendant's will was in any way overborn. Nothing in the present record indicates that the environment in which the interview occurred was inherently coercive, nor that the interviewers engaged in any threatening or coercive tactics. Similarly, nothing in the present record indicates that Defendant's medical condition was so severe as to render his waiver and statements involuntary.

The June 22, 2020, interview was conducted in a standard emergency room, which was separated by a door from the people working in the emergency room. (Tr. [Docket No. 44], at 16–17). Only two law enforcement officers, SA Hellekson and TFO Long, were present during the interview, and Defendant was not shackled. (Id. at 17). Nothing in the present record indicates that the interviewers physically restrained Defendant during the interview, nor that the interviewers made any threats or promises to Defendant to induce his rights waiver or statements. Further, the interview only lasted for approximately eight minutes, thus it was not coercive in its duration. See, e.g., United States v. Makes Room, 49 F.3d 410, 415 (8th Cir. 1995) (noting that interrogation

lasting more than two hours was not coercive in duration); Sumpter v. Nix, 863 F.2d 563, 565 (8th Cir. 1988) (finding confession was voluntary despite a seven and one-half hour interrogation).

The recording of the June 22, 2020, interview demonstrates that the interview was conducted in a conversational tone, and the interviewers made no threats or promises to Defendant. See, United States v. Mims, 567 F. Supp. 2d 1059, 1080 (D. Minn. 2008) (holding Miranda waiver voluntary where, among other factors, interview was conducted in a reasonable, conversational tone); see also, Makes Room, 49 F.3d at 415 (concluding no coercive tactics were used where, among other things, officers made no threats or promises to the defendant).

The recording of the June 22, 2020, interview also demonstrates that Defendant spoke willingly and non-defensively to the interviewers throughout, as well as, that he responded appropriately and coherently to any questions presented, which is consistent with SA Hellekson's testimony at the Motions Hearing that he understood what Defendant was saying, that Defendant sounded coherent, and that Defendant "seemed aware of what was going on."[9] (See, Id.; Tr. [Docket No. 44], at 20, 26). Although Defendant was laying in a hospital bed injured, the recording shows that he maintained the capacity to distinguish nuanced details. For example, after SA Hellekson repeated back to Defendant, about what happened before the alleged assault, "so you were talking about gang stuff," Defendant immediately corrected SA Hellekson and clarified that "they were talking about gang stuff."[10] (Gov't's Ex. 1, at 3:20). Moreover, the fact that Defendant was able to deny incriminating questions, such as whether he used any weapons to fight back or

---

[9] The Court notes that Defendant asserts that during the June 22, 2020, interview, he was "slurring his words and speaking in incomplete sentences" and he was, "at times, difficult to understand and sometimes his answers are nonsensical and unresponsive." (Mem. in Supp. [Docket No. 46], at 5). However, Defendant's assertion is not supported by the recording of the June 22, 2020, interview which clearly demonstrates that Defendant spoke clearly, coherently, and appropriately throughout the interview. (See, Gov't's Ex. 1).

[10] This not only demonstrates that Defendant was capable recognizing that SA Hellekson's use of the word "you" indicated that Defendant, as well as, Tiffany, Rob, and the unidentified male were all talking about "gang stuff," but also that Defendant retained the ability to dissociate himself from the conversation about "gang stuff." (See, Gov't's Ex. 1, at 3:20).

stabbed someone with a knife, further indicates that his will was not overborne. (See, Id. at 7:30–7:50).

In addition, although Defendant had previously been airlifted to the Sanford Health Hospital, two days had passed since the alleged assault and his admittance into the emergency room, and the record does not indicate that Defendant showed signs of severe pain or distress. Similarly, although Defendant's medical records from the morning of June 22, 2020, indicate that he was "mildly delirious after being struck in the face and head" and "appear[ed] to be in delirium secondary to possible TBI from assault," those medical records were created hours before the interview and nothing in the present record indicates that Defendant was at all delirious at the time the interview was conducted. (See, Def.'s Ex. 6, at 1). As already noted, the recording of the June 22, 2020, interview clearly shows that Defendant was able to coherently articulate appropriate answers to the interviewer's questions and to distinguish nuanced details. (See, Gov't's Ex. 1).

Defendant compares his circumstances to those in Mincey v. Arizona, 437 U.S. 385 (1978), but the circumstances here are readily distinguishable. For example, at the time of the interrogation in Mincey, the defendant had tubes "inserted into his throat to help him breath, and through his nose into his stomach to keep him from vomiting," and "he was unable to talk because of the tube in his mouth . . . so he responded to [law enforcement's] questions by writing answers on pieces of paper provided to the hospital." 437 U.S. at 396. Moreover, law enforcement continued the interrogation despite the fact that the defendant "complained to [law enforcement] that the pain in his leg was 'unbearable,'" requested a lawyer, "clearly expressed his wish not to be interrogated," gave several unresponsive answers, and "complained several times that he was confused or unable to think clearly, or that he could answer more accurately the next day." Id. at 398–400.

11

Here, by contrast, Defendant was able to speak clearly, and he responded to SA Hellekson's questions appropriately and coherently. Defendant did not complain of pain or the inability to think clearly, he never requested a lawyer, and he never expressed a desire to stop the interview. In addition, SA Hellekson testified that he would have stopped the interview if Defendant had made such a request. (Tr. [Docket No. 44], at 27).

Accordingly, under the totality of the circumstances, the Court concludes that Defendant's will was <u>not</u> overborne despite his injuries, and as such, his rights waiver and subsequent statements to law enforcement during the June 22, 2020, interview were voluntary. <u>See, e.g.</u>, <u>United States v. Warbritton</u>, 360 Fed. App'x 698, 699 (8th Cir. 2010) (affirming the denial of a suppression motion where "there was no evidence to suggest that law enforcement officers used coercive tactics while questioning [the defendant] after his vehicle accident, or that [the defendant's] will was overborne, despite his intoxication and injuries"); <u>United States v. Wright</u>, No. 15-89 (JNE/FLN), 2015 WL 4136083, at *4 (D. Minn. July 8, 2015) (concluding that statements made by a defendant who had three days earlier been shot seven times were voluntary where "at the time of the interview he showed no signs of severe pain or distress," a nurse had given permission for law enforcement to speak with him, and the interviewing officer testified that the defendant "seemed coherent and lucid throughout the interview"); <u>El-X</u>, 2011 WL 3155691, at *4 (finding that "the Defendant's will was not overborne, despite his injuries and medicated state" where "[h]e was coherent, did not stutter or slur, and did not complain of being in pain").

### 2. Knowing and Intelligent

Next, the Court must consider whether Defendant's waiver of his rights prior to the interview on June 22, 2020, was knowingly and intelligently made. <u>Vinton</u>, 631 F.3d at 483. The evidence in the record regarding Defendant's understanding of his rights and presence of mind

12

during the June 22, 2020, interview (as well as throughout the remainder of the interview) consists of the FBI Advice of Rights form signed by Defendant, the audio recording of the interview, some of Defendant's medical records from Sanford Health Hospital, photographs of Defendant taken at Sanford Health Hospital, and the hearing testimony of SA Hellekson.

Defendant contends that the Government has failed to demonstrate that Defendant's statements were knowing and intelligent because SA Hellekson only began recording the interview after Defendant had been informed of, and waived, his <u>Miranda</u> rights. (<u>See</u>, Mem. in Supp. [Docket No. 46], at 9–10). Defendant asserts that "[i]t is unknown what . . . [the interviewers] said to [Defendant] prior to beginning the audio recording," and "[t]hus, the record is incomplete because [SA] Hellekson chose to make it incomplete." (<u>Id.</u>). However, "[c]ourts in this District have repeatedly held that 'federal constitutional law does not require' recording of 'statements made by suspects subject to custodial interrogation' or a defendant's waiver of his <u>Miranda</u> rights." <u>United States v. Jones</u>, No. 19-cr-341 (NEB/LIB), 2021 WL 1321270, at *18 n.16 (D. Minn. Jan. 7, 2021), report and recommendation adopted by 2021 WL 960910 (D. Minn. Mr. 15, 2021) (quoting <u>United States v. Liu</u>, No. 8-cr-15 (ADM/FLN), 2008 WL 1994977, at *16 (D. Minn. Apr. 7, 2008)).

Here, on the present record, the Government offers sufficient evidence related to the June 22, 2020, interview for the Court to determine that Defendant's waiver of his <u>Miranda</u> rights at the outset of that interview was not only voluntary but also knowingly and intelligently made.

The present record indicates that a <u>Miranda</u> warning was given to Defendant both verbally and in writing. SA Hellekson read Defendant his <u>Miranda</u> rights line-by-line from the FBI Advice of Rights form. (Tr. [Docket No. 44], at 17–19, 21). After SA Hellekson read Defendant his <u>Miranda</u> rights, he instructed Defendant to sign the FBI Advice of Rights form if he wanted to talk

13

to the interviewers but to leave the signature line blank if he did not wish to speak with the interviewers. (Id. at 18–19). Defendant then signed the FBI Advice of Rights form indicating that he wished to speak with the interviewers, and the signing of such a form "carries a significant weight in determining whether [Defendant's] waiver was knowing and intelligent." United States v. Gallardo, 495 F.3d 982, 991 (8th Cir. 2007) (citing North Carolina v. Butler, 441 U.S. 369, 373 (1979)).

The fact that SA Hellekson did not begin recording the June 22, 2020, interview until after Defendant's waiver is immaterial. See, e.g., Jones, 2021 WL 1321270, at *18 n.16. Nothing in the present record indicates that the interviewers engaged in any coercive behavior to induce Defendant's waiver. Nor does anything in the present record indicate that the Miranda warning given to Defendant by SA Hellekson was in any way deficient. To the contrary, the FBI Advice of Rights form signed by Defendant clearly demonstrates that he was informed of his Miranda rights and expressly waived those rights. See, e.g., United States v. Duran, 109 F. Supp. 3d 1093, 1104 (D. Minn. 2015) (citing United States v. Zamarripa, 544 F.2d 978, 981 (8th Cir. 1976)) ("[A] waiver can be made orally or in writing; it need not assume any particular form.").

Moreover, nothing in the present record indicates that Defendant displayed any signs of confusion or the inability to understand his rights. As already noted, Defendant talked openly and clearly for the duration of the interview. Defendant provided appropriate, coherent, and responsive answers to the questions posed. Defendant never declined to answer questions or otherwise indicated that he no longer wished to talk. Although Defendant was injured, he did not complain of pain or the inability to think clearly, and he maintained the capacity to distinguish nuanced details and to deny incriminating questions.

Therefore, under the totality of the circumstances, the Court concludes that Defendant's waiver of his <u>Miranda</u> rights at the outset of the June 22, 2020, interview was knowing and intelligent.

## III.    CONCLUSION

Based on the foregoing and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1. Defendant's Motion to Suppress Statements, Admissions, and Answers, [Docket No. 27], be **DENIED**.

Dated: July 21, 2021                                    s/Leo I. Brisbois
                                                        Leo I. Brisbois
                                                        U.S. MAGISTRATE JUDGE

## N O T I C E

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "A party may file and serve specific written objections to a magistrate judge's proposed findings and recommendation within 14 days after being served with a copy of the recommended disposition[.]" A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing. If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.